Mr. Westenson, Petitioner, Ms. Greenfeld, the Respondent. I just want to say for the record that our colleague, Judge Henderson, will be unable to be with us today, but she will take the cases on the record, so she will have the record of the oral arguments and hear them. Thank you. Please proceed, Counsel. May it please the Court, my name is Neil Westenson and I'm here on behalf of Sunnyside Gold Corporation. The issue before the Court today is whether putting property on the National Priorities List without scoring that property pursuant to the Hazard Ranking System is contrary to law. As the Court is well aware, CERCLA provides the framework for listing property on the NPL. CERCLA requires the EPA to base any listing decision on the relative risk that a particular property might pose to the environment. They determine relative risk by scoring property pursuant to the Hazard Ranking System, or HRS. When EPA quantifies risk with the HRS, it can prioritize the response to risk. Congress specifically amended CERCLA in 1986 with the SARA amendments to require that the HRS prioritize risks to the maximum extent feasible, so that's the statutory standard. When EPA doesn't score property, it loses any ability to prioritize sites for cleanup, and when properties not scored, owners of that property lose any ability to question the process by which their property has been placed on the NPL. Listing property based on anything other than an HRS score or one of the statutory provisions is contrary to law. The listing in question today involves the 48 sites making up the Bonita Peak Mining District. It's depicted on a map on page 20 of the EPA's brief. Mr. Weston, if I understand the terminology correctly, those are sources and not sites. I disagree, Your Honor, and I think the terminology is loosely used by EPA in the regs and the statutes. Well, they're consistent in their brief in that respect. I don't think you are. And Mead corporate, that case, the Mead case, is in accord with the EPA's usage. EPA in Mead, it uses site throughout, there's the Tennessee product site and then the three sites that were within that, Coke Plant. Well, that was a case in about two different, or multiple sites being lumped together under the HRS. Here we have multiple sources being combined by the EPA into a site. If you call them sources or you call them sites or you call them areas or facilities, they still have to be scored to be listed. It makes a big difference in terms of your ability to rely on the Mead case. I disagree, Your Honor. The Mead case is on point as far as listing property without scoring it. You can't list a site or a source or a release unless it's scored. Well, that's true, of course, that nothing can be listed unless it's been scored. But the issue in Mead dealt with combinations into a site. You seem to be arguing that that's what is going on here and it doesn't seem to be. If you look at the area in question, it's 100,000 acres. These aren't adjoining pipelines coming out of a factory. That doesn't make it the largest site on the list. Size isn't alone determinative, Your Honor. It's that it's variable. It's that it's unique and the drainages are unique and the sites within it are unique and the properties that have been listed are unique. And EPA's approach has been to score some of those properties but list others. The others, they say, are between the ones that have been scored. And that's one of their explanations is that we can list the area between sources. And the problem with that approach is that standard applies when you have migration of hazardous materials from a scored source. An example is a smokestack or a groundwater plume. There's no migration here from a scored source upstream to some of the properties that have been listed. The geography of this area— The HRS one talks about properties between or sites or sources between, ranked sources. Sources between, but gravity only takes hazardous materials downstream. And I don't think EPA is allowed to pick a site in one corner of this map, pick one in the other, and then list everything in between. They've got to analyze the sources. That would be consistent with the HRS, wouldn't it? I mean, it might be arbitrary in some way, but it would be consistent with the HRS. It would be putting property on the NPL without scoring it. If they just pick a spot on one end of Colorado and one on the other and then list everything in between, that certainly can't be the way the HRS was intended to be applied. This area, as noted, is unique. It's got three different river drainages. It's got naturally acidic, naturally basic water. It's got variable history of different types of mining. EPA has lumped it all together and listed every property owner in that area as a PRP. That decision, that listing, this court has said has consequences. That was the Kent County case and Mead. We believe Mead does control the outcome in this case. There were the three products. The Tennessee product site consisted of a creek site, the dump site, the coke plant site. This court concluded that listing non-contiguous sites, whose listing cannot be individually justified by reference to EPA's risk or state designation criteria, is unlawful. The only way to list property absolutely— Are you saying their aggregation policy is unlawful? It was as applied in Mead and it is as applied in this case, Your Honor. Did Mead involve an HRS? It did not. It was a listing— We're talking about an entirely different situation. I think that's a distinction without a difference, Your Honor. It was a listing, and the court's decision didn't focus on whether it was a health advisory listing or otherwise. At bottom, you seem to be attacking a regulation beyond the time which you can do it. We're not attacking the HRS. We're attacking the fact that it wasn't applied here. They listed property without scoring it. It's not that the HRS isn't appropriately enacted. But they used the aggregation policy. They've called it that but without calling it aggregation. They've used the phrase commingled release instead, but the outcome is the same. You're using scores from some property to list other property. That's the outcome that was invalidated in Mead, and it should be invalidated here. EPA justifies its approach by claiming three things, that these sources or releases or sites all commingle as water flows downhill and downstream. They note, as Justice Ginsburg did, that a site can include an area between sources. And then they advise that a Superfund site can expand to anywhere hazardous materials come to be located. Each of those explanations doesn't justify the outcome or the listing here. That commingled release concept is new. It doesn't appear in the guidance. It doesn't appear in the regulations. The approach is really that water comes from different sources and heads downstream so we can list all of it. As noted, the problem here is on the map, the yellow sources were scored. The white sources were not. A lot of these white boxes are upstream of the yellow. So you've got water commingling and heading downstream, but property upstream where none of that commingling ever reaches is now on the NPL. There's been no showing that there's anything very similar about all of these sites. That was required in the U.S. Magnesium case. And what there has been is speculation that possibly these other sources might be releasing hazardous materials. They might or may also be contributing, but you can't base a listing based on speculation. When you say the water is flowing down, are you talking about surface water or ground? Both, Your Honor, but it always flows downhill. We don't need a footnote for that proposition. But I'm not sure that you know whether subsurface water is flowing in one particular direction simply because the surface is. That's a fair comment, Your Honor. In this case, the only scoring has been of observed surface releases. That was the EPA's position. We went out in the field and saw water on the surface flowing downhill. So there's not a case where groundwater may be migrating. Right, but why do you speak with such confidence about subsurface water? Knowing the geology in the area, this is the 10,000 feet. Some of it's at 11,000 feet. The mines are on the tops of these peaks, and the way EPA has approached it is to score a discharge from an individual mine, and that discharge all ends up in these three different rivers, the Animas, the Mineral Creek, and the Cemetery. What's going on below, though, is a mystery. I've had a slate roof, and the water flowed uphill on that roof until it found a place to flow downhill. That happens. If EPA wanted to say this water is getting onto your property or off of your property through a groundwater flow, they could have done that. They could have scored that kind of river. No, they haven't done it, and they don't know that. The question is why is it unreasonable to, using the HRS, to include an area simply because the surface water is flowing downhill? It's unreasonable to include an area that water doesn't reach, that hasn't been scored. Whether water is getting there from the surface water or the groundwater, there's no evidence that anything from these scored sources gets to the unscored sources. Even though they're mixed in randomly among the scoring ones. To the extent this graphic is misleading, that's because it's a 100,000 acre site. There are many miles apart between these mines, separated by ridges, by faults, by geology. How big is the area covered by that map? 100,000 acres. Can you put it in miles or kilometers? 10 miles by 10 miles. With this kind of topography in between, it's in the highest Rocky Mountain peaks in southwestern Colorado. EPA contends that the site boundaries extend to anywhere this co-mingled release comes to be located, but again, there's no evidence that anything comes to be located upstream or uphill from the scored releases. We've talked about the area between sources. The example of the Sunnyside Mine, which is the mine that my client owns, is a good example of what's wrong with EPA's approach. Sunnyside Mine sits at the highest point in this area. It's at the headwaters of the drainage. It was the largest mine in the area. It was the oldest mine. It operated for over 100 years on and off. It covered between private and public land over 100 acres. Significant remedial work was done on the Sunnyside Mine. My client spent about $15 million bulkheading the mine to contain any discharges, treated by injecting thousands of tons of lime into the mine, neutralized any acid water, and reclaimed that mine. Waste piles were moved. Holes were plugged. Soil was capped. And EPA ignored all of that. It wasn't completely remediated, was it? And I disagree that the regulations require complete remediation before it can be considered, but more troubling is the fact that EPA said, we didn't have to consider it because we didn't score it. So you've got a property owner spending $15 million to clean up their property to try and stay off the NPL, and now EPA can list it without scoring it, even considering any of that work. That's not reasonable. Scoring here of these other... So your argument is they have to individually score every source here. They have to at least score the sites that they've listed, and that's 48 that they identified. They went to the trouble of calling them out, and in their words... You want to conflate source and site. They called them out to provide notice. You want to conflate source and site. I don't, Your Honor, because I think either way they have to be scored. If you call it a source, a release, a site, a facility, an area... That's not what the regulations say. The regulations require scoring for listing, and if you're going to put property on the NPL, you need to score it. You have to consider what's coming off of it. If it's a source, if it's a release, it's got to be evaluated. Scoring here of these properties was feasible. EPA knows how to do it. They did it for 19 of these sites. They took the time to take samples and analyze them and apply the HRS and come up with the score. This case becomes real similar to the National Gypsum case where there was a test for toxic boron that the EPA could have administered, and then they would know if a property scored. They just didn't do the test, and as a result, this court vacated the listing. EPA could have scored the other sites that are listed if it wanted to. How many properties are there in the site as the EPA has defined the site? Could you say that again? How many properties are there, mining properties are there? Eighty percent of this land is owned by the federal government. Most of these mines are abandoned mines. And how many are there? There are at least 48 mines that have been identified. So they should have scored all 48? Yes, Your Honor. The approach EPA has taken is to say that we have called out these properties to give notice to the property owners. So they've given notice to Sunnyside Gold that they're on the NPL. That's important because when that notice is given, you've got to come forward within 90 days and challenge that listing. This court ruled that any untimely challenge is barred as untimely in the Department of Transportation case and in the Honeywell case. The problem is it's impossible to challenge how your property has been scored if it's never been scored. You're put in this position of needing to contest the scoring of what's brought you on to the NPL, but without any type of score, there's nothing to assess. Let me come back to it again because I want to make sure I understand your position. The regulation clearly distinguishes between site and sources, and the regulation clearly says that a site can include a number of sources. And you're taking issue with that regulation. I mean, this is clear. I'm looking at it just to be sure. You're arguing as if it's not there because you don't want it to be there, but it is there. The regulation absolutely distinguishes between a site and source, and it says that a site can include multiple sources. A site can include multiple sources. And it does not say that each of those multiple sources has to be scored. It says the site has to be scored. How does the owner of one of those sources challenge their ending up on the NPL? How does one get off the NPL? EPA ultimately concludes that you don't have to be on it. Because they later score it, or the owner does? How does it happen? Ultimately, I'm assuming it's evaluated as clean, but there's a lot of heartache that happens between now and then. You're listed on the NPL. Your property's got that taint, and you're subject to the coercive power of the EPA. Well, the coercive power, what does that mean? That they might come in and confirm what you're saying, that is, that there was remediation and you're fine? No, that they might send you a bill for cleanup of property elsewhere in the site, that they might ask that you enter into an administrative order on consent for monitoring property that's never been used before. That isn't a right question right now, is it? It's a consequence of the listing. It's an absolute consequence that you, if you're within the site and your particular source has been completely remediated nonetheless, there's a regulation that says you'll have to pay a bill. As applied right here, that's exactly the consequence. No, is there some regulation that says that? It's the national priority list that CERCLA provides for that. What I'm asking you is, is there some regulation that says individual sources, remediated or not, within the site, will carry the same financial burden? I think they're identified as part of the NPL. Is there some regulation that supports? I hear what your concern is. Is there some regulation that supports that? I think the regulations in the HRS support it and the NPL regulation. I'm over time. Thank you. I'll give you a little time for rebuttal. May it please the Court. My name is Megan Greenfield, and I'm here on behalf of EPA. With me at Council's table is Eric Swenson from the Office of General Counsel. This Court should reject the challenge to the listing of the Benita Peak Mining District site on the national priorities list. The Benita Peak Mining District site is a single site that encompasses the release of multiple mining sources. EPA determined that the site was eligible for listing by scoring 19 mining areas, all of which discharged acid mine drainage into the surface water. This acid mine drainage comes together and intermixes as surface water moves downstream through the Upper Animas River watershed. The site scored 50, well above the 28.5 score required for NPL eligibility. Does it matter whether individual sources are contributing to the problem? It's true that there are other sources that EPA did not assess as part of the site that may be contributing, but that does not impact the HRS score here. The sources that EPA assessed were contributing so much hazardous substances to the surface water that it maxed out the surface water contamination score at 50. So if EPA had gone out in the field and scored every other possible source that it had identified, it could not have lowered the score. No, that's not my question. I understand that. What I'm asking is, does it matter that any individual sources are contributing nothing to the problem? No, it doesn't matter for scoring purposes. And it doesn't matter because a site is allowed to consist of multiple sources, and the score can be based on only part of those sources. That is what this court and the HRS provide. And in the next step, when there are consequences, does it matter if some sources within the site are contributing nothing? They're totally remediated. Yes, that will be taken into account in the next step when the full scope of contamination is determined. And what's the regulation that says that? I don't have the specific regulation before me, but I'm happy to provide that to the court. Because counsel on the other side seems to be unaware of any such regulation and is suggesting that when you get to the final consequences, everyone pays equally. Now, I'm just not sure. That sounds surprising to me, but I'm curious to know if there's a regulation that says something to the contrary. Yes, that is not how CERCLA works. CERCLA does not require automatic payment from all of the sources within a site. It's true that it allows for joint and several liability, but that liability can be apportioned in different ways, depending on things like remediation and through the process like allocation. So that's certainly possible. It's also true that if an area of a site is completely remediated, that in those later stages, when the remedial plan is constructed, that those areas can be carved out from the site. That can happen at a later time. It seems that Petitioner is arguing today that EPA is required to score every specific parcel within a site before listing it on the NPL. That's not what this Court has held. For example, in Washington Department of Transportation, that argument was specifically rejected, that EPA does not need to score every single parcel within a site. And indeed, as a practical matter, that would make little sense. Many sites have many hundreds of sources, like this one here, for example, has many hundreds of mining sources because mining took place over a century with different owners and at different times. But think of a common industrial plant. Their approach would have EPA score every barrel of leaking hazardous substances before listing that site as a whole. I mean, that isn't the law, and it would lead to untoward consequences. The HRS assessment process is supposed to be a quick and inexpensive way for EPA to evaluate relative risk. Well, a more generous view of their position is, look, I'm an owner, and this is a whole lot of property. I'm upstream, and we understand, for convenience's sake, you want to have a site that includes multiple sources. Just don't put us in the site. We're upstream. We're not doing anything now. We're contributing nothing, so cut the line of the site south of us, if you don't mind, and then we'll be perfectly happy, and we'll applaud your efforts. Right. It seems as though they're arguing for a checkerboard approach where their individual mine would be omitted because they claim that they've done some remedial work in the past. There is no basis for that. There is no record evidence that the contamination that was contributed to by the Sunnyside mine has been fully contained. Is that a critical consideration? If EPA had scored that source, it would have needed to assess whether it was contained. I'm saying as an equitable matter here. No, is it a critical consideration that they are still contributing to some extent to the problem, or is your answer that we know that in the past they did, and that's enough? Which is it? We know that in the past they did, and that's enough. I knew you would say that. In your view, that's all you need. They did it in the past. We don't have to look at it anymore. Historical contamination that is still present is enough, and here the Sunnyside mine contributed historical contamination. What you just said would still be true if they currently remediated it completely. The substances would still be present, but they wouldn't have been the source. It's possible that they could perhaps remediate aspects of the mine itself, but because of the nature of the contamination here. For example, when the Lake Emma collapsed, it was a dozen-acre lake that drained through the Sunnyside mine, spilling hazardous wastes through the entire valley. That, too, would have to be remediated, not just a single tailings pile. You have to take into account the remediation of the contamination that this source has caused. And another point here is that— When was that? Sorry? When did that happen? The historical contamination— No, no, the event you just described. So the Lake Emma, it's documented at JA-141 as part of the HRS stock record. That happened in 1978. So it was before this present corporation purchased the mine, but they were aware at the time of purchase that this contamination had taken place. And the Sunnyside mine is also, it's worth noting, physically connected with a number of the other mine workings because we're looking at a caldera here, so it's the inside of a mountain. And the Sunnyside mine is physically connected through mining tunnels, like the Terry Tunnel and the American Tunnel, but also through fissures in the rock itself. The rock is not solid, so water can move over and around bulkheads. It can move from one mine to another mine. And so there's no basis for excluding the Sunnyside mine here, given that it's physically connected with some of the other squirt sources. Why was it not feasible to score this mine? At the time that the listing was being undertaken, EPA did not have current waste quantity information of the precise amount of hazardous waste that remained at the mine, and then it did not have a current chemical analysis of the release that was being emitted. What it did have was documentation that the Sunnyside mine and also all the other possible sources were involved in the same mining activities and the same geological formation and created the same wastes and were uncontained. So that was sufficient to include those and provide notice to the parties. That may have been sufficient, but why wasn't it feasible to do more? So EPA could have gone out in the field and done this, but once it reached— Isn't that the statute, right, not the regulations? To make everything feasible. The statute, it's within the realm of possibility, but once EPA reached the 28.5 threshold for listing, it was not required by the regulation or this court's precedence to go further. This court held— That's your site source, are you? I'm sorry? That is your site source, are you? That is the site source argument, and it's also based on this court's precedence. In the CTS court, for example, where it said EPA's analysis need not be exhaustive. It need not apply every single methodology to determine the scope of contamination because the process here is supposed to be quick and inexpensive. The precise scope of contamination is determined at later phases. Well, I think from what impression we got from counsel for the petitioners here, the NPL is sort of a roach motel, right? You go in and you don't come out, at least not with your money, because you're going to be held liable one way or another for some of the damage. There is certainly a concern about liability from petitioners, but that is—liability is not addressed at this stage of the process. That is considered later. I understand that, but it does suggest that feasibility be taken seriously. And EPA does take feasibility seriously. Keep in mind, too, that these mines are located at upwards of 10,000 feet, so they're very, very high. Sampling of these sources often requires chartering a helicopter and landing it on— this is the mine top, so it's very difficult to get to. Also, there's a very limited time when you can actually observe these releases because of what they call the warp season, because it's frozen solid for much of the year. So EPA has a small frame of time where it can get out in the field. And because this site in particular is releasing so many hazardous substances, it was of utmost concern that it be listed as soon as practicable. And once EPA reached the 8.5 threshold, and indeed nearly doubled it, it was appropriate then for EPA to take the next step of listing and then begin work in the field once it had access to that funding that was available after the listing occurred. So listing it as soon as practicable, is that the standard? That is not the standard in the statute. I'm saying that here, as a practical matter, assessing each and every mine that was listed here as other possible sources would have taken a considerable amount of time. It also would have not had any ability to impact the HRS score because, as I said earlier, the surface water pathway, which EPA assessed, had already been maxed out. So there was no way for it to alter the score. It would have been going out in the field and doing these chemical tests in a way that could not impact the overall HRS score. And EPA will assess those mines. Indeed, it is doing work in the field now to assess that precise scope of contamination. When we're thinking about the listing process, depending on the size of the site, there's always more work that could be done in assessing each and every source. So, I mean, you're rising and falling on the legal position that your regulation clearly distinguishes sites and sources, and that in determining a site, you have acted consistently with the regulation and the statute by considering whether these sources are physically connected, same geological area, and contributors to the overall problem. That's what your argument is? So our argument is that we've acted consistent with the statute in scoring these sources, all of which contribute to the single problem. No, I'm talking about the creation of the site. The creation of the site. There's got to be an obligation. There's got to be some kind of principles that you have to follow to determine the site. Right. And as I understand your argument, you're saying consistently with the statute, we can determine the site. You have a test that you follow. Right. Which includes things like physically connected, geographical area, contributors to the problem. Right. I'm not using your words, but those are the notions. And we consider all of that. And another aspect that we consider. I mean, what you're saying is in answer to our question, so all of this stuff about the sources within are of no moment under established precedent. Our regulation is there. It says what it says, and they can't challenge it now. Right, and they haven't even attempted to do so. Yes, that's true. Another consideration in taking into account how the site was created is that the HRS itself, when analyzing the surface water contamination pathway, repeatedly looks to the watershed as a whole. And that's in Section 4 of the HRS. And that makes sense here, too, because what we have is the headwaters region of this watershed. So taking into account that the contamination is widespread throughout this headwaters region, there really is no way of addressing the problem by nitpicking individual sources. It has to be looked at as a whole. And as I mentioned earlier, we have the scored sources and the unscored possible sources. There are many other sources there that haven't both known and unknown. EPA documented the unscored sources here to provide those parties notice that their parcel was part of this area. And the other part of your argument is the liability determination is circling 106, 107, and they can raise defenses. Exactly, and that can happen at a later phase. Ownership, acts of God, et cetera. Exactly. There are other defenses available to them. They are not automatically liable as a result of the listing. You don't have to take your last 30 seconds. If the panel has no further questions, I ask that the Court deny the petition for review. Okay, thank you. How much time does he have? Give you two minutes, Counsel. Thank you, Your Honor. Okay. I'll be brief. There's a map on page 20 of EPA's brief that is what the site should look like. That's the scored sources and the rivers that flow down from it. The idea that you can list now and we'll sort it out later has been rejected by this Court. You've got to follow the procedures for listing. There was no good answer to the Court's question about why wasn't this feasible to score our property. EPA has been studying this area for 20 years. There's just absolutely nothing in the record about helicopters or short seasons or why there was no ability to score it before it was listed. That's a post hoc rationalization that ought to be rejected. The truth is there's no evidence in the record that the Sunnyside Mine is a source, that it is a release, that it is something contributing to hazardous material in this area, and yet EPA has listed it. And when you list property without assessing it, scoring it, you deprive the property owner of the ability to consider what's been done and to fight the listing of where they're ending up. The idea that we'll just take care of it in Section 106 or 107, that's a lot of money and time and angst down the road that could be avoided now if the listing was done right. Thank you. Thank you. The case is submitted.
judges: Henderson, Edwards, Ginsburg